UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Abdurhim M. Pasic,

   Plaintiff,

  v.           Civil Action No.2:11-CV-261

Commissioner of Social Security,

   Defendant.


## OPINION AND ORDER
### (Docs. 4, 7)

  Plaintiff Abdurhim Pasic brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits.  Pending before the Court are Pasic's motion to reverse the Commissioner's decision (Doc. 4), and the Commissioner's motion to affirm the same (Doc. 7).  For the reasons stated below, the Court DENIES Pasic's motion, and GRANTS the Commissioner's motion.

## Background

  Pasic was forty years old on his alleged disability onset date of April 3, 2007.  He was born and raised in Bosnia, where he graduated from high school.  He fought in the Bosnian War from 1991 to 1994, during which time he observed the destruction of his village and extensive violence.  He lost multiple family members in the War, and has

since suffered flashbacks and nightmares.  In 1994, Pasic relocated to the United States as a refugee.  He has worked as a factory worker, a truck driver/deliverer, a custodian, a sandblaster, a painter, and a taxi driver.  He lives with his wife and three children.

Pasic suffers from coronary artery disease (clogged arteries), and has had three heart attacks since 2004, resulting in several surgical procedures including implantation of stints and a defibrillator.  Despite his heart condition, and against his doctors' orders, Pasic smoked cigarettes for much of the alleged disability period.  Also despite his heart condition, he was able to play soccer and work as a cab driver for parts of the alleged disability period.  In addition to his heart problems, Pasic has had back pain since an injury at work in 2001.  Although he testified at the administrative hearing that this pain prevented him from sitting for more than forty-to-sixty minutes at a time, he was not seeing a doctor for his back problems as of the date of the hearing.  (AR 51-53.)  Pasic also suffers from depression, anxiety, and sleep problems; and one medical provider stated that he appeared to meet the criteria for post-traumatic stress disorder ("PTSD").

On January 29, 2010, Pasic filed an application for disability insurance benefits.  Therein, he alleged that, starting on April 3, 2007, he has been unable to work due to "[h]eart attacks, c[h]olesterol, [and] blood pressure."  (AR 199.)  He explained that these conditions caused him fatigue, weakness, and inability to tolerate stress.  (*Id.*)  Pasic's application was denied initially and upon reconsideration, and he timely requested an administrative hearing.  The hearing was conducted on March 8, 2011 by Administrative Law Judge ("ALJ") Dory Sutker.  (AR 31-73.)  Given his inability to speak and understand English, Pasic appeared and testified through an interpreter.  He was

represented by an attorney.  Vocational expert ("VE") Christine Spaulding also testified

at the hearing.  On March 21, 2011, the ALJ issued a decision finding that Pasic was not

disabled under the Social Security Act at any time from his alleged onset date through the

date of the decision.  (AR 8-20.)  The Appeals Council denied Pasic's request for review,

rendering the ALJ's decision the final decision of the Commissioner.  (AR 1-3.)  Having

exhausted his administrative remedies, on October 27, 2011, Pasic filed the Complaint in

this action.  (Doc. 1.)

### ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).

The claimant is presumptively disabled if the impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the

claimant's residual functional capacity ("RFC"), which means the most the claimant can

still do despite his or her mental and physical limitations based on all the relevant

medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1),

416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the

claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§

404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the

claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at

383; and at step five, there is a "limited burden shift to the Commissioner" to "show that

there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, ALJ Sutker first determined that Pasic had not

engaged in substantial gainful activity since his alleged disability onset date of

April 3, 2007.  (AR 10.)  At step two, the ALJ found that Pasic had the following severe

impairments: coronary artery disease, status post-myocardial infarction; cardiomyopathy;

and affective disorder.  (AR 11.)  Conversely, the ALJ found that Pasic's back pain and

PTSD were not severe impairments.  (AR 12.)  At step three, the ALJ found that none of

Pasic's impairments, alone or in combination, met or medically equaled a listed

impairment.  (AR 13-14.)  Next, the ALJ determined that Pasic had the RFC to perform

sedentary work[1], except as follows:

> [Pasic] must avoid exposure to hazardous machinery and work performed at unprotected heights.  He is limited to routine and repetitive tasks but can apply common sense understanding to deal with problems involving a few concrete variables in or from standardized situations.

(AR 14.)  The ALJ also determined that, considering Pasic's testimony at the administrative hearing that he could not read English, "he should avoid tasks that require following written instructions."  (*Id.*)  Given this RFC, the ALJ found that Pasic was unable to perform his past relevant work as a truck driver, custodian, sandblaster, or painter.  (AR 19.)  Finally, based on testimony from the VE, and considering Pasic's age, education, work experience, and RFC, the ALJ determined that Pasic could perform other jobs existing in significant numbers in the national economy, including document preparer, stuffer, semi-conductor assembler, eye glass frame polisher, and bit tapper. (AR 19-20.)  The ALJ concluded that Pasic had not been under a disability from the alleged onset date of April 3, 2007 through the date of the decision.  (AR 20.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his

---

[1]  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a).  A sedentary job "is defined as one which involves sitting," although "walking and standing are required occasionally."  *Id.*

"impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

**I.    Analysis of Medical Opinions**

Pasic argues that the ALJ failed to properly consider the opinions of his treating physician and two state agency mental health consultants, resulting in an erroneous RFC determination.  For the reasons stated below, the Court rejects this argument.

**A.    Dr. Carey's November 2010 Opinion[2]**

In November 2010, Dr. Kevin Carey, Pasic's treating cardiologist, completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical), wherein he opined that, due to Pasic's "advanced heart disease," his functional capacity was "fair."  (AR 817.)  Dr. Carey opined that Pasic could occasionally lift up to fifty pounds, frequently carry up to ten pounds, and occasionally carry up to fifty pounds.  (AR 813.) The Doctor further found that Pasic could stand and walk for two hours each in an eight-hour workday, *sit for five hours in an eight-hour workday*, occasionally climb stairs and ramps, occasionally operate a motor vehicle, and never be exposed to unprotected heights or moving mechanical parts.  (AR 814-17 (emphasis added).)  The ALJ gave "significant weight" to the majority of this opinion, finding that it was "generally supported by the record as a whole" and "essentially consistent with the evidence."  (AR 17.) Accordingly, the ALJ's RFC determination largely mirrored Dr. Carey's findings, except that, in determining that Pasic could perform only sedentary work, the ALJ assessed greater limitations in lifting and carrying than those assessed by Dr. Carey.

---

[2] Pasic does not contest the ALJ's assessment of Dr. Carey's February 2011 opinion.

The ALJ rejected, however, Dr. Carey's restriction to five hours of sitting, finding instead that Pasic could sit for six hours, as is generally required for sedentary work. *See Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 n.5 (2d Cir. 2001) (quoting *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)) (internal quotation omitted) ("The ability to sit for a total of four hours does not generally satisfy the standard for sedentary work. According to the Social Security Administration, "sedentary work generally involves up to *two hours of standing or walking* and *six hours of sitting* in an eight-hour work day.") (emphases in original); *see also* SSR 83-10, 1983 WL 31251, at *5 (1983) (for sedentary work, "sitting should generally total approximately 6 hours of an 8-hour workday"). The ALJ explained: "[T]here is nothing in the record to limit sitting to five hours rather than six hours." (AR 17.) Pasic contends that, "[i]n fact, there is plenty in the record to support th[e] finding [that Pasic could sit for no more than five hours in an eight-hour workday]." (Doc. 4 at 8.) Yet the only evidence Pasic cites in support of this contention is Dr. Carey's February 2011 Medical Assessment Form, wherein the Doctor restricted Pasic to sitting for about four hours in an eight-hour workday. (AR 1016.) Pasic also asserts that he had open heart surgery with follow-up procedures, and consistently reported debilitating pain resulting in Dr. Carey ordering repeated cardiac testing. (Doc. 4 at 8.) But Pasic testified at the administrative hearing that his ability to sit was limited by his back pain, not his heart condition. (*See* AR 53-54.) More importantly, the record supports the ALJ's determination that, despite his back pain and heart condition, Pasic could sit for up to six hours in an eight-hour workday, as required for sedentary work.

First, as noted by the ALJ, Pasic worked as a cab driver for portions of the alleged disability period, which presumably required him to sit for extended periods. (AR 18, 44, 227, 389, 637, 686, 712, 810, 864, 866.) In fact, Pasic reported in a Disability Report that he was working as a cab driver for eight hours a day, five days a week. (AR 200-01.) In a Function Report, Pasic did not indicate that his impairments affected his ability to sit, and left blank a box that he could have checked to indicate that his conditions affected his ability to sit. (AR 227-32.) Moreover, although Pasic testified at the administrative hearing in March 2011 that he drove his cab for only "maybe like three hours a day," a March 2010 medical note from cardiologist Dr. Adam Kunin recorded that Pasic was "working very long hours," driving his cab for "up to [fifteen hours] a day." (AR 795.) A May 2008 medical note states that, although Pasic was complaining of intermittent back pain, he "fe[lt] fine if he [wa]s sitting or lying down." (AR 392.) Another note from that month states that Pasic "fe[lt] best when he [was] sit[ting]." (AR 394.) This evidence supports the ALJ's finding that Pasic could sit for at least six hours in an eight-hour workday.

The ALJ also observed that Pasic sat through the entire administrative hearing, which lasted for over two hours, without changing positions. (AR 18, 33, 73.) Pasic contends that the Second Circuit in *Carroll v. Secretary of Health and Human Services*, 705 F.2d 638 (2d Cir. 1983), "has clearly stated that an ability to sit through a hearing is not a proper basis for determining the weight and credibility of a treating source." (Doc. 4 at 9.) Although it is true that in *Carroll*, the Second Circuit held that an ALJ's observation of the claimant's abilities and limitations exhibited during the hearing, "being

9

that of a lay person," is entitled to only "limited weight," *id.* at 638, in a later case, the

Second Circuit clarified that an ALJ may consider her own recorded observation of the

claimant at the hearing as part of her overall assessment of the claimant's credibility, *see*

*Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) (citing 20 C.F.R. § 416.929(c)(3); SSR

96-97p, 1996 WL 362209 (July 2, 1996)).  The court explained:

> [W]e have not held that it is always error for an ALJ to take account of a
> claimant's physical demeanor in weighing the credibility of her testimony
> as to physical disability.  Although such observations should be assigned
> only "limited weight," there is no *per se* legal error where the ALJ
> considers physical demeanor as one of several factors in evaluating
> credibility.

*Id.*  The regulations also allow for such consideration, providing that "observations by

our employees and other persons" will be considered, in conjunction with all the other

relevant evidence, when determining the extent to which the claimant's symptoms limit

his or her capacity for work.  20 C.F.R. § 404.1529(c)(3).  Therefore, the Court finds no

error in the ALJ's consideration of Pasic's ability to remain seated throughout the

administrative hearing as one piece of evidence, among others, demonstrating Pasic's

ability to sit for six hours in an eight-hour workday.

The ALJ further observed that Dr. Carey's own treatment notes were inconsistent

with his opinion that Pasic could not perform full-time sedentary work.  (AR 17.)  The

record, as discussed in the ALJ's decision (*see, e.g.,* AR 15-17), supports this

observation.  For example, Dr. Carey's progress notes from January and September 2008

indicate that Pasic was experiencing "no recurrent significant chest pain" despite being

"fairly active."  (AR 15, 328, 519.)  In May 2009, Dr. Carey recorded that, although Pasic

was occasionally anxious and his temper could be short, he thought he was "doing quite well," and "ha[d] not been bothered by any sense of anginal-quality chest pain." (AR 637.) Dr. Carey further noted that Pasic was working as a cab driver, and concluded that Pasic "seems clinically stable." (*Id.*) In a March 2010 medical record, noting that Pasic was "working very long hours up to 15 a day," Dr. Kunin, who is associated with Dr. Carey's practice, stated that Pasic was "doing reasonably well." (AR 795.) Dr. Kunin recorded that, although Pasic was having chest pain, he thought that was "due to his stomach" because the pain occurred when he stopped using Prilosec, a medication used to treat heartburn. (*Id.*) In September 2010, Dr. Kunin recorded that, although Pasic was having chest pressure which usually occurred while driving his cab, his physical examination was "unremarkable" and he was "doing well." (AR 810.) Dr. Kunin made no changes to Pasic's treatment regimen, and scheduled a follow-up appointment for six months later. (*Id.*) There does not appear to be any discussion in Dr. Carey's or Dr. Kunin's treatment notes regarding Pasic's alleged limited ability to sit, and it does not appear to be an area of treatment or concern.

Pasic finds fault with the ALJ's recognition of Pasic's ability to play soccer in the context of her discussion of Dr. Carey's opinion regarding Pasic's ability to sit. (Doc. 8 at 8-9.) Clearly, Pasic's ability to play soccer sheds little light on Pasic's ability to sit, given that sitting is not required in the game of soccer. The ability to play soccer does, however, indicate that Pasic was able to perform the occasional standing and walking required to perform sedentary work. Also noteworthy, even when Dr. Carey advised Pasic in April 2010 not to play "vigorous soccer and other high level exercise," the

Doctor still recommended "a good steady program of walking, bicycling, etc." (AR 782), which supports the ALJ's determination that Pasic could perform sedentary work.

Finally, Pasic asserts that the ALJ substituted her own "medical opinion" over that of Dr. Carey in determining that Pasic could sit for at least six hours in an eight-hour workday. But the ALJ's assessment of Pasic's ability to sit does not constitute a medical opinion, and the ALJ was allowed, in fact required, to consider all the relevant evidence and determine Pasic's RFC, including his ability to sit during the alleged disability period. For these reasons, the Court finds that the ALJ considered the relevant factors, including consistency with the record as a whole, in analyzing Dr. Carey's November 2010 opinion. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Moreover, the Court finds that substantial evidence supports the ALJ's determination that, despite Dr. Carey's opinion to the contrary, Pasic was able to sit for six hours in an eight-hour workday during the alleged disability period.

### B.    Mental Health Consultant Opinions

Pasic also contends that the ALJ erred in failing to afford weight to the opinions of state agency mental health consultants M. Berkowitz and Dr. Joseph Patalano that Pasic should be limited in his contact with the public. In relevant part, Berkowitz opined that "[l]essened public contact would likely be beneficial to optimize [Pasic's] performance" (AR 695); and Dr. Patalano similarly opined that Pasic "should be limited from contact

with the general public due to possible outbursts of anger related to PTSD[3]" (AR 765).

The ALJ rejected these opinions on the grounds that they were not supported by the

record. (AR 18.) The Court agrees. In a Function Report, Pasic reported no problems

getting along with others, and failed to check off a box indicating that his impairments

affected his ability to "[g]et[] along with others." (AR 232.) To the contrary, Pasic

reported that he spent time each day talking with others and attended mosque services

every Friday. (AR 231.) There is no indication in the medical records that Pasic had

difficulty socializing, and in fact, at least two of his medical providers referred to him as

"exceptionally pleasant" and "very pleasant." (AR 799, 956.) Moreover, as noted by the

ALJ, Pasic's ability to work as a cab driver, which presumably required frequent

interaction with others, and his ability to occasionally participate in team sports,

including soccer, are inconsistent with a limited ability to interact with the public. (AR

12.) The record taken as a whole does not demonstrate that Pasic was required to limit

his contact with the public, and Pasic fails to cite any evidence supporting such a

limitation.

## II.    Credibility Assessment

Pasic challenges the ALJ's credibility assessment with respect to Pasic's mental

impairments, arguing that the ALJ should have discussed Pasic's credibility in the

specific context of his depression, anxiety, or PTSD. (Doc. 4 at 11.) In support of this

claim, Pasic cites his own testimony at the March 2011 administrative hearing that he

---

[3] As noted earlier, the ALJ found that Pasic's PTSD was not a severe impairment (AR 12), and Pasic does not challenge that finding.

was, at that time, "considering seeing the doctor and talking to him about [his] nervousness and . . . depression"; and that his "depressive state" had been "getting worse" for the prior three years.  (AR 54.)  The ALJ did in fact acknowledge Pasic's allegations regarding a mental impairment, stating that Pasic "report[ed] feeling sad and irritable at times" and "reported ongoing problems with irritability and frustration."  (AR 11.)  But the ALJ found that, based on her review of the entire case record, Pasic's allegations regarding the severity of his mental impairments were not credible; and the ALJ properly gave specific reasons in support of this finding.  *See* SSR 96-7p, 1996 WL 374186, *4 (July 2, 1996) ("When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.").

First, the ALJ correctly noted that there is no evidence of regular psychiatric treatment or psychiatric hospitalizations.  (AR 18; *see also* AR 12 (ALJ noting that there is "no medical evidence of treatment for [PTSD]").)  Although Pasic was referred to counseling in 2009, a medical note indicates that he had not followed up for at least several months.  (AR 712.)  Second, the ALJ rightly stated that, on the few occasions that Pasic reported feeling sad to medical providers, his primary care physician merely prescribed Wellbutrin and encouraged him to maintain increased physical activity.  (AR 18, 614.)  In a July 2008 note, the provider stated, "consider counseling in the future," indicating that counseling was not required at that time.  (AR 614.)  Third, the ALJ noted that, although Pasic testified at the administrative hearing that he sometimes felt sad, irritable, and frustrated, he "never mentioned problems with flashbacks, nightmares,

14

intrusive memories, [or] avoidance of things associated with [the Bosnian War][.]"  (AR

12.)  Especially considering Pasic's limited mental health treatment and ability to engage

in fairly taxing activities – including driving a taxi cab and playing soccer – the Court

finds that the ALJ properly considered the entire case record and gave correct reasons for

her credibility assessment regarding Pasic's mental impairments.  *See Arnone v. Bowen*,

882 F.2d 34, 39 (2d Cir. 1989) (plaintiff's failure to seek medical attention during alleged

disability period "seriously undermine[d] his contention that he was continuously

disabled during that time"); *Mahoney v. Apfel*, 48 F. Supp. 2d 237, 246 (E.D.N.Y. 1999)

("the ALJ is permitted to attach significance to plaintiff's failure to seek medical

treatment"); SSR 96-7p, 1996 WL 374186, at *3, 5-6 (Jul. 2, 1996) ("in assessing the

credibility of a claimant's statements, an ALJ must consider . . . the claimant's daily

activities").  Moreover, substantial evidence supports the ALJ's assessment of Pasic's

credibility regarding his mental impairments.

## III.   Pasic's Inability to Speak English

Next, Pasic argues that the ALJ erred when she utilized Rules 201.23 or 201.28 of

the Medical-Vocational Guidelines ("the Grids") as a framework for determining Pasic

was not disabled.  Pasic first asserts that he "falls under Rule 201.23," as opposed to Rule

201.28.  (Doc. 4 at 13.)  Confusingly, he then quotes from a case holding that Rule

201.23 is inapplicable where, as here, "'the claimant is both illiterate and unable to

communicate in English.'"  (*Id.* (quoting *Martinez v. Heckler*, 735 F.2d 795 (5th Cir.

1984)).)  Interpreting Pasic's argument in a light most favorable to him, the Court finds it

unpersuasive.

Rule 201.28 clearly does not apply here, as it does not account for Pasic's limitations regarding the English language.  Rule 201.23 applies to claimants who are between the ages of eighteen and forty-four, whose previous work experience is "[u]nskilled or none," and who are "[i]lliterate *or* unable to communicate in English."  20 C.F.R. pt. 404, subpt. P, app. 2, table 1 (emphasis added).  Relying on the Fifth Circuit's holding in *Martinez*, Pasic argues that, because he is both illiterate *and* cannot communicate in English, the ALJ should not have applied Rule 201.23 as a framework for her decision.  The decision in *Martinez* does not apply here, however, for the following reasons.

In response to the *Martinez* decision, the Commissioner issued Acquiescence Ruling ("AR") 86-3(5)[4].  Therein, the Commissioner "acquiesced" that, pursuant to *Martinez*, in cases brought by claimants who reside in the Fifth Circuit (Texas, Mississippi, or Louisiana), Rule 201.23 may not be applied if the claimant is both illiterate and unable to communicate in English.  AR 86-3(5), 1986 WL 68649, at *2 (Jan. 23, 1986).  But with respect to all other claimants, including Pasic here, the Commissioner explained as follows:

> In formulating the grid rules, it was assumed that a person who is unable to communicate in English would naturally be illiterate in English.  Illiteracy is subsumed under inability to communicate in English.  It has thus been longstanding SSA policy that the rules applying to individuals who are illiterate *or* unable to communicate in English also apply to those who are illiterate *and* unable to communicate in English.

---

[4]  Although they are not given the force and effect of law, Social Security rulings (including ARs) are entitled to deference, unless they are clearly erroneous or inconsistent with the Social Security Act. *See Walker v. Sec'y of Health and Human Servs.*, 943 F.2d 1257, 1259-60 (10th Cir. 1991); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

*Id.* (emphases in original).  The Ninth Circuit considered AR 86-3(5), and found that the Commissioner's interpretation of the language used in Rule 201.23 fell within the Social Security Administration's rulemaking powers and was thus consistent with the Social Security Act.  *See Chavez v. Department of Health and Human Services*, 103 F.3d 849, 852 (9th Cir. 1996).  The District of New Jersey similarly found, stating: "Although the phrase 'inability to communicate' is not technically defined to include writing, one who is unable to speak, read and understand is unable to write.  Therefore, if an individual is unable to communicate in English, by definition, she is also considered to be illiterate in English."  *Flecha v. Shalala*, 872 F. Supp. 1312, 1317 (D. N.J. 1994).

In light of the applicable Acquiescence Ruling, the Court finds that the Fifth Circuit decision in *Martinez* is not controlling in this case, and further finds that the ALJ did not err in relying on the Grids as a framework for finding Pasic not disabled, even though he appears to have been both illiterate and unable to communicate in English during the alleged disability period.  Although not raised as an issue in Pasic's motion, the Court notes that the ALJ erred in stating at step five that Pasic "is able to communicate in English."  (AR 19.)  The error appears to have been merely typographical, however, as the ALJ clearly was aware of Pasic's inability to communicate in (and read) English, given that: (1) an interpreter attended the administrative hearing and interpreted for Pasic (AR 32-33); (2) the ALJ questioned Pasic at the hearing about his ability to read English, and Pasic stated that he could not (AR 43); (3) the ALJ questioned Pasic at the hearing about his ability to understand English and Pasic stated that his English was "not very good at all" and he could understand

17

"very little" (AR 46); (4) the ALJ included in her RFC determination the following restriction: "[Pasic] testified that he cannot read English [and thus] he should avoid tasks that require following written instructions" (AR 14); and (5) the ALJ included in hypotheticals to the VE the limitation of "[i]nab[ility] to read written instructions" (AR 60, 64). Moreover, the ALJ's typographical error was harmless, given that application of the correct rule, Rule 201.23, which (as discussed above) accounts for both illiteracy and inability to communicate in English, would direct a finding of not disabled. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, table 1.

## IV. Step-Five Vocational Determination

Pasic next contends that the ALJ erred in her step-five vocational determination by finding that Pasic could perform the jobs of document preparer and semi-conductor assembler. (Doc. 4 at 14.) Pasic asserts that these jobs exceed his work capacity because they require the ability to read and write in English. (*Id.*) Even assuming this argument has merit, it does not require remand or reversal because the ALJ's decision included three additional jobs that Pasic could do, and Pasic challenges neither his ability to perform any of those three jobs nor the existence of those jobs in significant numbers in the national economy.

Specifically, as noted above, the ALJ found that there were five jobs existing in significant numbers in the national economy that Pasic could do, including document preparer, stuffer, semi-conductor assembler, eye glass frame polisher, and bit tapper. (AR 19-20.) Removing the jobs of document preparer and semi-conductor assembler still leaves the jobs of stuffer, eye glass frame polisher, and bit tapper, which apparently do

18

not require an ability to read and write in English.  The regulations require that a significant number of jobs exist in only "one or more occupations."  20 C.F.R. § 404.1566(b).  Therefore, even if Pasic was able to do only one of the five jobs which the ALJ determined existed in significant numbers in the national economy, a finding of not disabled would be appropriate. *See Martin v. Comm'r of Soc. Sec.*, No. 5:06-CV-720 (GLS/DEP), 2008 WL 4793717, at *12 (N.D.N.Y. Oct. 30, 2008) (citing 42 U.S.C. §§ 423(d)(1), (A)(d)(2)(A), 1382c(a)(3)(A), (B)) ("Despite plaintiff's argument to the contrary, even the finding that one job exists in sufficient numbers in the national economy capable of being performed by the plaintiff is sufficient to sustain the Commissioner's burden at step five.").  For this reason, Pasic's challenge to the ALJ's step five finding is unavailing.

Also noteworthy, in compliance with SSR 00-4p, the ALJ asked the VE at the administrative hearing if the five jobs which the VE testified a hypothetical claimant like Pasic could do were consistent with the Dictionary of Occupational Titles ("DOT"), and the VE responded: "Yes, . . . they are consistent with the DOT."[5]  (AR 60.)  *See* SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) ("At the hearings level, as part of the [ALJ's] duty to fully develop the record, the [ALJ] will inquire, on the record, as to whether or not there is [a] consistency [between the occupational evidence provided by the VE and the occupational information supplied by the DOT].").  Pasic did not object to this testimony, and failed to raise the issue at the hearing that, according to the DOT, and in

---

[5]  Although this particular testimony related to the ALJ's first hypothetical, which did not include the limitation that the hypothetical claimant "was unable to read written instructions," the ALJ then asked the VE if her response would change if the claimant was unable to read written instructions, and the VE responded: "No, my response would not change."  (AR 60.)

apparent conflict with the VE's testimony, two of the five applicable jobs required the ability to read and write in English.  As the Commissioner points out, although the Second Circuit has not yet ruled on this issue, other circuits have held that a claimant may not, as Pasic attempts to do here, argue to the district court that the VE's testimony conflicts with the DOT where the claimant or his attorney did not raise that issue at the administrative hearing, at least in cases where the alleged conflict is not apparent or obvious.  *See, e.g., Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) ("[T]he failure of Overman's counsel to identify the conflicts [between the VE's testimony and information supplied by the DOT] at the time of the hearing is not without consequence. Overman now has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00-4p requires only that the ALJ investigate and resolve apparent conflicts between the VE's evidence and the DOT."); *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000) ("claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing").  The Court need not decide this issue here, however, given that the ALJ alternatively determined there were three other jobs that Pasic could do and Pasic has not challenged that finding.

## **<u>Conclusion</u>**

For these reasons, the Court DENIES Pasic's motion (Doc. 4), GRANTS the

Commissioner's motion (Doc. 7), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 31st day of August, 2012.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge